STATE OF CONNECTICUT *v.* JAMES R. DAVIS
(11603)

FOTI, LANDAU and SCHALLER, Js.

Argued May 7—decision released July 13, 1993

*Jacques J. Parenteau,* for the appellant (defendant).

*Carolyn K. Longstreth,* assistant state's attorney, with whom were *Peter McShane,* assistant state's attorney, and, on the brief, *C. Robert Satti, Sr.,* state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of robbery

in the first degree in violation of General Statutes § 53a-134 (a) (4) and larceny in the second degree in violation of General Statutes § 53a-123 (a) (3). He claims that the trial court (1) improperly failed to declare a mistrial (a) following a claim of juror misconduct and (b) after a violation of a court order on a motion in limine,[1] and (2) improperly instructed the jury regarding (a) identification, (b) flight and consciousness of guilt, and (c) the limited purpose for which they could consider a witness' prior inconsistent statement. We affirm the trial court's judgment.

The jury reasonably could have found the following facts. Shortly before midnight on June 14, 1990, the defendant, wearing a ski mask and armed with a .45 caliber semiautomatic pistol, entered Dino's Pizza in Norwich. A restaurant employee, Arthur Patsouris, was alone and about to secure the establishment for the night. The defendant, dressed in jeans and a hip length, olive green army jacket, pointed the weapon at Patsouris and told him not to "do anything stupid." The defendant, who spoke with a southern accent, then demanded to be shown the safe. After Patsouris told him that there was no safe, the defendant took approximately $1000 from Patsouris. The money included the day's cash receipts, as well as personal money of the victim. The defendant then asked Patsouris where he could put him. Patsouris suggested the handicapped bathroom, but, because it had to be secured from the inside, the defendant instead ordered Patsouris into a cooler. He told Patsouris he did not want him to freeze. After Patsouris said that he would be fine, the defendant stated that he would leave the cooler unlocked. He ordered Patsouris to remain in the cooler for ten minutes and threatened to come back and kill him if he

---

[1] At oral argument before this court, the defendant, through counsel, withdrew an additional claim that the trial court improperly failed to declare a mistrial on the basis of a combination of these two actions.

called the police. After waiting three minutes, Patsouris left the cooler and called 911.

Although Patsouris could make no identification of the man who robbed him, he did describe the man as a six foot tall caucasian with dirty blond or light brown hair.

On June 14, 1990, the defendant was living at the Starlight Motel in Niantic with his girl friend, Dani Carlson, her two children and a friend, Sue Donadio. That evening, the defendant and Carlson went on his motorcycle to Great Oak Pizza in Norwich, where he had planned a robbery. The defendant and Carlson argued about the way he was operating the motorcycle. They went to Dino's Pizza and turned around in the parking lot several times. Carlson got off the motorcycle and began walking along the road. The defendant drove back toward Dino's Pizza. Sometime thereafter, the defendant drove back to Carlson and told her to get on the motorcycle. After getting on, Carlson felt bulges on both sides of the defendant's waist that she had not felt earlier. As they left Norwich, the defendant threw something from the motorcycle.

The defendant and Carlson returned to the motel in Niantic, where the defendant removed a .45 caliber semiautomatic pistol from his coat and put it on a dresser. He then stated that he had robbed someone of $1000. The defendant told Carlson that he had argued with the victim when he had been told that there was no safe, and that he had locked the victim in a bathroom or a freezer.

The next morning the defendant told Carlson to pack. After leaving her five month old daughter with her sister, Carlson, her son and Donadio went to the bus station and boarded a bus for Florida. The defendant was with them until they boarded and then followed the bus

on his motorcycle. The defendant is from Florida and speaks with a southern accent.

I

A

The defendant first claims that the trial court improperly failed to declare a mistrial sua sponte after a juror was exposed to a newspaper article that mentioned the defendant.

The pertinent facts are as follows. The jury began deliberations on Thursday, April 16, 1992. On the following Monday, shortly before the court adjourned for the day, the jury sent a message to the court that it was deadlocked. Over the weekend, the defendant had attempted an escape from Somers prison. Because there had been news articles regarding the escape attempt on Tuesday, the court summoned the jurors and inquired whether any of them had "read, heard or seen anything involving any of the parties." One juror, the foreperson, answered affirmatively. After excusing the remaining jurors, the court conducted a voir dire.

The juror stated that when she opened the New London Day, she saw a headline about an escape attempt and started to read the article. She stopped reading when she saw the defendant's name. She added that she did not know whether the defendant had been involved in the escape because she did not read any further than his name. The trial court then advised the juror that this case had to be decided only on the evidence presented at trial and then asked her what effect, if any, the portion of the article she had read would have on her decision in this case. The following colloquy ensued:

"[Juror]: It hasn't yet—well, let me put it this way. Discussions that we've had in the jury, a lot of dis-

cussions people have tried to speculate on his character or past practices and—

"[The Court]: I don't think you have to tell us what was going on in there.

"[Juror]: —I'm a firm believer of this case is what we are looking at no matter what other circumstances there are in his life have no bearing on this particular case. So, I don't feel that seeing his name in that— attached to that headline has anything to do with this case.

"[The Court]: Okay, so, in other words, you feel confident that you could decide this—even though, no matter what, the little bit you know about that, that would have nothing to do with this case.

"[Juror]: I don't know enough to even think about it.

"[The Court]: What I would request that you do then is this. In your discussions with your fellow jurors on this particular case would you be able not to discuss this aspect of the situation at all? In other words, just not bring this up at all?

"[Juror]: Yes.

"[The Court]: So, that no matter what your discussions, even somebody ask you, you would not—

"[Juror]: No, it doesn't bear on this case.

"[The Court]: —Okay. And you feel confident that you could decide the case without—irrespective of reading this portion of the article. And you wouldn't bring that into the case at all with your fellow jurors?

"[Juror]: No."

The court then allowed the juror to return to the deliberations. The court stated: "I'm not going to excuse her or declare a mistrial at this time." Although

defense counsel conferred with the defendant, no exception was taken and no motions or requests for further inquiry or curative instructions were made. After additional instructions,[2] the jury deliberated and then returned its verdict.

"Due process requires that a criminal defendant be given a fair trial before an impartial jury. U.S. Const., amend XIV; Conn. Const., art. 1, § 8. *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982). A new trial, however, is not required every time ' "a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." ' *Rushen* v. *Spain,* 464 U.S. 114, 118, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983), quoting *Smith* v. *Phillips,* 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

"The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. *State* v. *Hancich,* 200 Conn. 615, 624–25, 513 A.2d 638 (1986); *State* v. *Gaston,* 198 Conn. 490, 495–96, 503 A.2d 1157 (1986); *State* v. *Ubaldi,* 190 Conn. 559, 562, 464 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *State* v. *Gooch,* 186 Conn. 17, 25, 438 A.2d 867 (1982); *State* v. *Turcio,* 178 Conn. 116, 143, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980). The trial court enjoys wide discretion in deciding whether a mistrial is warranted; *Speed* v. *DeLibero,* 215 Conn. 308, 315, 575 A.2d 1021 (1990); *State* v. *Nowakowski,* 188 Conn. 620, 624, 452 A.2d 938 (1982); and its evaluation as to events occurring before the jury is to be accorded the

[2] The court gave the Chip Smith antideadlock charge. *State* v. *Smith,* 49 Conn. 376 (1881); *State* v. *Pinnock,* 220 Conn. 765, 795, 601 A.2d 521 (1992).

highest deference. *United States* v. *Grasso,* 600 F.2d 342, 343 (2d Cir. 1979). Every reasonable presumption will be given in favor of the trial court's ruling; *State* v. *Rodriguez,* 10 Conn. App. 176, 179, 522 A.2d 299 (1987); because the trial court, which has a firsthand impression of the jury, is in the best position to evaluate the critical question of whether the juror's or jurors' exposure has prejudiced a defendant. See, e.g., *United States* v. *Wiley,* 846 F.2d 150, 157 (2d Cir. 1988); *State* v. *Asherman,* 193 Conn. 695, 736, 478 A.2d 227, cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion. *State* v. *Rodriguez,* 210 Conn. 315, 326, 554 A.2d 1080 (1989); *State* v. *Fleming,* 198 Conn. 255, 264, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986)." *State* v. *Harvey,* 27 Conn. App. 171, 177–78, 605 A.2d 563, cert. denied, 222 Conn. 907, 608 A.2d 693 (1992).

The right to a jury trial means the right to a fair trial by a panel of impartial, indifferent jurors who will decide the case solely on the basis of the evidence presented after proper instructions on the law by the court. *State* v. *Migliaro,* 28 Conn. App. 388, 395, 611 A.2d 422 (1992).

Whether the juror's viewing of extrinsic material was prejudicial to a defendant depends on "the magnitude of the juror's deviation from [her] proper role, the degree to which the accused was deprived of the benefits of the constitutional and statutory safeguards, and the likelihood that the impropriety influenced the jury's verdict." *State* v. *Asherman,* supra, 739. Where it appears that a juror has been exposed to prejudicial extrinsic evidence, the trial court must conduct an investigation to determine whether jury misconduct

occurred, and whether there was a reasonable possibility of prejudice. *State* v. *Migliaro,* supra, 396.

The trial court conducted the necessary inquiry. Since merely reading the newspaper article was not sufficient to disqualify the juror; *State* v. *Marra,* 195 Conn. 421, 433, 489 A.2d 350 (1985); the court's inquiry was necessary to determine whether harmful prejudice appeared to have resulted from her inadvertently having seen the newspaper. The court implicitly found no prejudice. Since the question of bias did not rise beyond the realm of speculation to the realm of fact; *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d 1326 (1983); the trial court cannot be said to have abused its discretion in ruling sua sponte that it would not declare a mistrial. It was not unreasonable for the trial court to assume that its voir dire examination would disclose any prejudice on the part of the juror; see *State* v. *Vitale,* 190 Conn. 219, 229, 460 A.2d 961 (1983); and that, in light of her assurances, the juror could decide the case fairly and impartially.

B

The defendant also argues that the trial court improperly refused to grant his motion for mistrial made during the direct examination of a state's witness. We disagree.

The defendant filed, and the court granted, a motion in limine whereby the state's witnesses were prohibited from referring to the defendant's prior arrests, convictions or trials. During cross-examination of a police officer, defense counsel inquired about the date the officer had arrested the defendant in this case. The officer answered May 14, 1991. Thereafter, the state sought, through Carlson, to introduce the defendant's gun into evidence. In laying the foundation, the state's attorney elicited the fact that during the six months Carlson had known the defendant before the robbery,

she had seen him with what he told her was a .45 caliber semiautomatic weapon. Carlson affirmed that she had seen the defendant with the same weapon on the day of the robbery. The state then asked Carlson if she had ever seen the defendant with the gun after the robbery. She answered, "Yes, in Florida." The state asked her what she recalled about the time she saw the gun in Florida. She described how the defendant complained about rust on the gun's safety. The state asked the witness if she recalled the date, and Carlson said June 27. The state then inquired what happened on June 27 and Carlson answered, "The police came to arrest him."

After requesting that the jury be excused, the defendant moved for a mistrial, arguing that it was prejudicial to elicit the fact of this June, 1990 arrest when the jury already knew that the defendant had been arrested in connection with the present case in May, 1991. The court asked the state if the June, 1990 arrest had been on another matter. The state answered affirmatively, adding that the jury obviously knew the defendant had been arrested and that the question was designed to allow the jury to infer that the gun that the state intended to offer was one that the defendant had both before and after the robbery. Carlson, who was still present, then interjected that she had answered the question as she did because that was the only way she remembered the date June 27.[3]

The trial court made a finding that the purpose of the testimony was to show why the witness remembered seeing the gun on June 27, 1990. The court then denied the motion for mistrial, stating that because there had already been testimony concerning the defendant's arrest, Carlson's reference was not going

---

[3] Carlson stated: "[T]he reason why I said June 27th, is because I wanted to clearly say, yes, I saw that gun on that day. And that's the only way I remember that day is that."

to shock the jury or cause harm. The court further stated its intention to instruct the jurors at the appropriate time that they should draw no inference from the fact that the defendant had been arrested and that an arrest has no probative value, adding "I don't want to do it now." The defendant took an exception but made no request to have the witness' remark stricken.

During Carlson's direct examination, the parties stipulated that four receipts from the Starlight Motor Inn could be admitted into evidence. Noting that the cards indicated the room was registered to a Sara Bonita, the state asked Carlson about that name. Carlson testified that it was she and explained: "Bonita is my son's last name. And Jimmy said to use a different last name. A different name, period. So I used Bonita. I knew that the cops were looking for Jimmy." The defendant immediately objected and asked to have the jury excused, and the court sustained the objection. The defendant then moved to strike the testimony. The court granted the motion and, when the jury returned, instructed the panel to disregard the witness' answer. The state's direct examination continued. The defendant later moved for a mistrial on the ground that this remark caused irreparable prejudice. The motion was denied.

During its instructions to the jury after the close of the evidence, the trial court told the jurors that they must consider only the testimony and exhibits that were admitted into evidence. The court further reminded them that if some testimony had been given but stricken, they should not consider it because the rules of evidence "have proven to be the fairest and the most just in most occasions." Then, in discussing the presumption of innocence, the trial court charged the jury that "nothing that you knew about [the defendant's] past or might guess about his past should be considered by you at all." The court also charged: "[The infor-

mation] is not evidence of anything. It is simply a charging sheet that indicates to the defendant what he is accused of in some detail and it indicates what the state has to prove. But, it doesn't itself prove anything. Also, there was evidence of the defendant's arrest. Now, the evidence of arrest is also not really probative of the value of guilt in this particular matter. You have to decide that strictly on the basis of the evidence that came in during the course of the trial." The defendant took no exception to these aspects of the jury charge.

The defendant now claims that Carlson's two references to his dealings with the police directly impinged on his presumption of innocence and his constitutional right to a fair trial. The defendant also argues that the state cannot prove that these two references were harmless beyond a reasonable doubt.

In the absence of a clear indication to the contrary, a jury is presumed to follow the trial court's instructions. *State* v. *Negron,* 221 Conn. 315, 331, 603 A.2d 1138 (1992). As to Carlson's first remark about the defendant's arrest in Florida, we conclude that under the circumstances of this case the trial court's final charge to the jury, to which the defendant made no exception, adequately addressed the improper reference. The defendant sought no curative instruction regarding the Florida arrest, nor did he earlier request to have the remark stricken. Additionally the defendant has failed to demonstrate that the admission of this statement affected the jury's verdict. *State* v. *Moody,* 214 Conn. 616, 629, 573 A.2d 716 (1990).

As to Carlson's second remark, regarding the police "looking for" the defendant, the court promptly granted the defendant's motion to strike and properly instructed the jury to disregard the remark. The defendant relies heavily on *State* v. *Sierra,* 213 Conn. 422, 426–29, 568 A.2d 448 (1990), to bolster his claim

that it was "more probable than not that the erroneous action affected the result." This reliance is misplaced, however, since in *Sierra* evidence of the defendant's uncharged conduct was introduced by the state and admitted into evidence. In the present case, Carlson's testimony that the police were pursuing the defendant was not admitted; rather, the witness volunteered this comment before any objection could be interposed. The reference was not prejudicial beyond cure, requiring an automatic mistrial, but rather falls into the category of witness remarks requiring a case-by-case analysis to determine their effect. See *State* v. *Gary,* 211 Conn. 101, 108–109, 558 A.2d 654 (1989). We are convinced that any prejudice that the defendant may have initially suffered was eliminated by the trial court's prompt action and thorough instruction.

The trial court properly denied the defendant's motions for a mistrial. Because the defendant has not sustained his burden of establishing that he was deprived of a fair trial, we cannot conclude that the trial court abused its discretion in not declaring a mistrial.

## II

### A

The defendant next claims that the trial court failed to instruct the jury adequately that identification had to be proved beyond a reasonable doubt. He contends that the court did not give a specific instruction regarding identification and the dangers inherent in eyewitness identification. The defendant did not file a request to charge, but did note his exception to the court's failure specifically to instruct the jury that it had to find beyond a reasonable doubt that the defendant was the person who had committed the robbery.

Failure to instruct on identification does not raise an issue of constitutional magnitude. *State* v. *Tillman,* 220 Conn. 487, 501, 600 A.2d 738 (1991), cert. denied, U.S.    , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). To prevail on this claim, therefore, the defendant must establish that it was reasonably probable that the jury was misled by the court's instruction. *State* v. *Cerilli,* 222 Conn. 556, 567, 610 A.2d 1130 (1992). The defendant's theory of defense was not misidentification by the victim because eyewitness identification was not possible. His theory of defense was not inconsistent with the identification given by Carlson as to what she saw and heard. Carlson was not an eyewitness to the crime and her identification of the defendant was certain and clear as to his being the person who told her of the robbery. The testimony of the victim, corroborated by that of Carlson, convinces us that there was no reasonable probability that the jury was misled.

We have also examined the entire charge "to determine whether it is reasonably possible that the instruction misled the jury." *State* v. *Ortiz,* 217 Conn. 648, 667, 588 A.2d 127 (1991). In doing so, we have been careful not to "sever one part of the instruction and analyze it separately from the whole. *State* v. *Johnson,* 185 Conn. 163, 168, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983)." *State* v. *Milardo,* 224 Conn. 397, 409, 618 A.2d 1347 (1993).

Our analysis of the entire charge leads us to conclude that the jury was not misled by the trial court's instruction. The court made it clear that the elements of each crime had to be proven beyond a reasonable doubt and, in so explaining, the court specifically addressed the defendant's identity. In reviewing the elements of the crime of larceny, the court stated that the first element was that the defendant wrongfully took property from an owner; thereafter, the court instructed that the state had the burden of proving "beyond a reasonable doubt

that *the defendant* committed a larceny in that *he* wrongfully took property from an owner, here Mr. Patsouris." (Emphasis added.) In summarizing the elements of the crime of robbery, the court stated: "To find the defendant guilty of this offense, you have to find that it has been proven beyond a reasonable doubt in accordance with these instructions and the information, one, that *the defendant* committed a larceny as that crime has been defined for you. Two, that in the course of committing the larceny *the defendant* threatened the immediate use of physical force against another person. Here Arthur Patsouris." (Emphasis added.)

The court repeatedly told the jurors that, because the evidence was particularly strong that a robbery and a larceny had been committed, the central question for the jury to resolve was whether the defendant was the one who committed the crimes. These instructions can have left no doubt in the jurors' minds that, to convict the defendant of the crimes charged, they had to be convinced beyond a reasonable doubt that the defendant was the perpetrator.

## B

The defendant next claims that the trial court improperly instructed the jury that flight was strong evidence of guilt rather than evidence justifying an inference of guilt.

The court instructed as follows: "In a criminal trial it is perfectly proper to show that the defendant's conduct after the commission of the alleged criminal act may fairly [be believed] to have been influenced by the criminal act itself. Such evidence is called consciousness of guilt and you may find that it is strong evidence that the defendant is indeed guilty. Flight is a form of circumstantial evidence [that] when considered with all other facts in the case might justify an inference of the

defendant's guilt. In this case, there was evidence that the defendant left for Florida on June 15, 1990, the day after the robbery at Dino's. The flight of a person accused of committing a crime is a circumstance which when considered together with all of the facts of the case you may conclude is strong evidence of guilt. . . . [I]t is up to you to determine whether or not the defendant did leave for Florida on June 15, 1990. And if you find that he did it is up to you to draw what inferences you feel appropriate from this act that you may find to have been proven."

Unexplained flight tends to prove a consciousness of guilt. *State* v. *Piskorski,* 177 Conn. 677, 723, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). It "is a circumstance which, when considered together with all the facts of the case, may justify an inference of the accused's guilt." *State* v. *Rosa,* 170 Conn. 417, 433, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976). "Additionally, the state of mind that is characterized as 'guilty consciousness' or 'consciousness of guilt' is strong evidence that a defendant is indeed guilty." *State* v. *Moody,* supra, 626.

The trial court's charge, taken as a whole, properly informed the jury that they were to determine if, in light of all of the facts and circumstances established by the evidence, an inference of guilt should be drawn. The charge contained permissive terms such as "you may find," "you may conclude," "if you find," and "it is up to you to determine," as well as the admonition "when considered with all other facts in the case [that] might justify an inference." The court also left it for the jury to decide the underlying fact, i.e., whether the defendant actually left for Florida on June 15, 1990, the day after the robbery. Accordingly, we find no merit to the defendant's claim that the instruction on flight was improper.

## C

Finally, the defendant contends that the trial court improperly refused to instruct the jury that it could consider a signed statement given by Carlson to a police officer in Florida for the truth of the matter asserted in it. We disagree.

The pertinent facts are as follows. Carlson testified that the defendant followed the bus that she took to Florida on the day after the robbery. The defendant introduced a signed statement of Carlson's, given to the Florida police, that indicated that the defendant did not arrive in Florida until the day after her arrival. During the state's voir dire and later, in response to the defendant's cross-examination, Carlson testified repeatedly that she did not remember giving the statement. She also testified that she could not recall whether she had been warned regarding the consequences of giving false information, as indicated in a printed warning at the top of the statement. Carlson eventually recalled giving the statement and when the state questioned her regarding the inconsistency, she said that her trial testimony was true and that she remembered that the defendant followed her bus to Florida the day after the robbery.

Carlson's statement was admitted as a prior inconsistent statement, but the jury was instructed that they could consider it for credibility purposes only. The court would not allow substantive use of the statement under *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The court determined that in the absence of testimony from the Florida police describing the procedure used in taking the statement, this evidence lacked sufficient reliability.

The admission of prior written statements for substantive purposes is governed by our Supreme Court's decision in *State* v. *Whelan,* supra, 753. "[T]he rationale underlying the *Whelan* exception to the hearsay rule is that its requirements assure reasonable reliability." *State* v. *Hopkins,* 222 Conn. 117, 123, 609 A.2d 236 (1992). To be admissible for substantive purposes, a prior inconsistent statement must have been given under circumstances ensuring its reliability and trustworthiness. *State* v. *Grant,* 221 Conn. 93, 100, 602 A.2d 581 (1992). "It is the trial court's responsibility to weigh the reliability of each statement on a case-by-case basis." *State* v. *Hopkins,* supra, 126.

From our review of the record, we conclude that the trial court properly determined that Carlson's prior statement lacked sufficient reliability to permit its admission for substantive purposes. Carlson's inability to remember having given the statement or the circumstances under which she gave it raised the question of reliability. Even after her recollection was refreshed, Carlson could not recall whether she had been warned about giving false information. The court properly allowed the statement to be used for credibility purposes only.

The judgment is affirmed.

In this opinion the other judges concurred.